22CA2077 Peo v Rose 08-01-2024 COLORADO COURT OF APPEALS Court of Appeals No. 22CA2077 La Plata County District Court No. 19CR247 Honorable Todd P. Norvell, Judge The People of the State of Colorado, Plaintiff-Appellee, v. Robert Dean Rose, Defendant-Appellant. ORDER AFFIRMED Division VII Opinion by JUDGE GOMEZ Kuhn and Richman*, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced August 1, 2024 Philip J. Weiser, Attorney General, Jaycey DeHoyos, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee Barbara A. Snow, Alternate Defense Counsel, Longmont, Colorado, for Defendant-Appellant *Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2023. 
1 ¶ 1 Defendant, Robert Dean Rose, appeals the postconviction court’s denial of his Crim. P. 35(c) motion following a hearing. We affirm. I. Background ¶ 2 In 2019, M.W. was shot and killed on his property in La Plata County. Following a police investigation, Rose was arrested and charged with first degree murder, tampering with a deceased human body, first degree aggravated motor vehicle theft, and tampering with physical evidence. ¶ 3 Pursuant to a plea bargain, Rose pleaded guilty to an added charge of second degree murder with open sentencing and all other charges were dismissed. The trial court sentenced Rose to forty-six years’ imprisonment — near the top end of the presumptive range of sixteen to forty-eight years. ¶ 4 Rose timely filed a Rule 35(c) motion for postconviction relief and was appointed postconviction counsel. In relevant part, Rose claimed that his plea counsel rendered ineffective assistance by failing to investigate and present the following mitigating evidence at the sentencing hearing: 
2 • evidence of his “pervasive and extensive history of substance abuse and its impact on his functioning”; • evidence of his “pervasive and extensive mental health history and its impact on his functioning”; • evidence of his industriousness for the twenty years he’d worked in manual jobs and the injuries he’d sustained and losses he’d witnessed as a result of that work; and • evidence that he was a “very caring individual.”
1 ¶ 5 The postconviction court granted a hearing on the motion. At the hearing, the defense presented expert witness Dr. John Dicke, who testified as an expert in psychology with a focus in “assessing and treating trauma and dissociative identity disorder [DID] as a result of trauma.”
2 1 Rose has abandoned the other Crim. P. 35(c) claims that he initially raised to the postconviction court but doesn’t reassert on appeal. See People v. Delgado, 2019 COA 55, ¶ 9. 2 DID, formerly known as multiple personality disorder, “is characterized by a) the presence of two or more distinct personality states or an experience of possession and b) recurrent episodes of amnesia.” Am. Psychiatric Ass’n, Diagnostic and Statistical Manual of Mental Disorders 330 (5th ed., text rev. 2022). 
3 ¶ 6 Dr. Dicke testified that he diagnosed Rose with bipolar disorder, post-traumatic stress disorder, and DID after meeting with him twice, conducting projective testing on him, and reviewing his criminal and mental health records (which didn’t include any previous diagnosis of DID). Dr. Dicke testified that Rose has an alternate identity named Duke, whom Rose “created in order to get through very difficult times as a child.” According to Dr. Dicke, Duke is “a protector alter,” is “much more aggressive” than Rose, and exerts greater control over Rose when Rose is intoxicated. Dr. Dicke also testified that Rose’s childhood trauma — including poverty, social isolation, alcoholic parents, domestic abuse in the family home, being beaten by his parents with a belt and a wooden spoon, and being punished by his father for reading difficulties caused by dyslexia — is “consistent with the creation of [DID].” ¶ 7 Dr. Dicke opined that Duke was in control of Rose’s actions at the time of the murder and that Rose wasn’t fully conscious of what was happening. Dr. Dicke based this opinion largely on the second meeting with Rose — specifically, Rose’s insistence that he didn’t know exactly how the shooting had transpired; Duke’s appearance during the meeting, in which he exhibited tics and then talked with 
4 a very different voice and demeanor than Rose, acted aggressively, and cursed and refused to answer questions; and Rose’s indication that he didn’t know what happened during the part of the meeting when Duke had taken over. When asked if he had any sense that Rose was malingering when Duke appeared, Dr. Dicke answered, “No. It was real. It was real.” ¶ 8 After the hearing, the postconviction court denied Rose’s Rule 35(c) motion in an oral ruling followed by a written order. The court declined to address whether Rose’s plea counsel’s performance was deficient because it determined that, regardless, Rose wasn’t prejudiced. The court explained that much of the information presented in the motion and at the hearing was available at sentencing, which the same judicial officer had conducted. The court also said that the new information regarding DID wouldn’t have made a difference at sentencing, noting that • it was doubtful about the DID diagnosis, notwithstanding that it found Dr. Dicke credible as a witness; • it found that even if the diagnosis was legitimate, Rose “rolled the dice” by ingesting alcohol and methamphetamine (which he knew exacerbated his 
5 condition) and then going to the victim’s home with a gun when he was already agitated with the victim for not paying a debt owed to him; and • the new information didn’t change its mind about the appropriateness of the original sentence. II. Ineffective Assistance of Counsel ¶ 9 On appeal, Rose contends that the postconviction court erred by denying his ineffective assistance of counsel claim on the basis of a lack of prejudice. We disagree. A. Standard of Review and Applicable Law ¶ 10 We apply the two-prong test established in Strickland v. Washington, 466 U.S. 668 (1984), when assessing a defendant’s claim of ineffective assistance of counsel under Rule 35(c). To prevail on such a claim, a defendant must show that (1) counsel’s performance was constitutionally deficient and (2) the deficient performance prejudiced the defense. Id. at 687; People v. Sharp, 2019 COA 133, ¶ 11. ¶ 11 To satisfy the deficient performance prong, the defendant must overcome the “strong presumption that counsel’s performance did not fall below an objective standard of reasonableness.” Sharp, 
6 ¶ 11. To satisfy the prejudice prong, the defendant must show “a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Id. (quoting Strickland, 466 U.S. at 694). In this context, this means that the defendant must show a reasonable probability that the sentence would’ve been more lenient. See People v. Rodriguez, 914 P.2d 230, 296 (Colo. 1996). If a court determines that a defendant hasn’t adequately proved either of the two prongs, it may deny an ineffective assistance claim without addressing the other prong. People v. Villanueva, 2016 COA 70, ¶ 66. ¶ 12 A postconviction court’s ruling on a Rule 35(c) motion after a hearing presents a mixed question of fact and law. Sharp, ¶ 12. We defer to the court’s factual findings if they are supported by the record, but we review de novo the court’s legal conclusions, including the court’s ultimate determinations on the performance and prejudice prongs. Id. B. Analysis ¶ 13 Rose presents three arguments challenging the postconviction court’s conclusion that he didn’t show his plea counsel’s failure to introduce evidence of DID had prejudiced him at sentencing. 
7 ¶ 14 First, Rose asserts that the court had to accept Dr. Dicke’s DID diagnosis, as it was based on Dr. Dicke’s expertise and firsthand observation of Rose and was not rebutted by the prosecution’s cross-examination or any other evidence. But the postconviction court, as the trier of fact on the ineffective assistance claim, had the sole responsibility “to weigh the credibility of witnesses, to determine the weight to give all parts of the evidence, and to resolve conflicts, inconsistencies, and disputes in the evidence.” People v. Poe, 2012 COA 166, ¶ 14. And the “trier of fact is not required to accept a witness’ testimony, even [if] it is uncontroverted.” In re Estate of Owens, 2017 COA 53, ¶ 22 (alteration in original) (quoting People v. Fordyce, 705 P.2d 8, 9 (Colo. App. 1985)). Similarly, “the trier of fact may reject unpersuasive expert testimony, even if uncontroverted.” Kim v. Grover C. Coors Tr., 179 P.3d 86, 97 (Colo. App. 2007). We are bound by the court’s assessment and cannot reweigh evidence, remake credibility determinations, or otherwise substitute its judgment with our own. See Estate of Owens, ¶ 22. 
8 ¶ 15 Second, Rose asserts that the postconviction court’s finding that Dr. Dicke was credible is inconsistent with its finding that Dr. Dicke’s opinion about Rose’s diagnosis was not credible. ¶ 16 On this point, the court expressed skepticism during the presentation of evidence at the Rule 35(c) hearing: Why should I not be skeptical that Mr. Rose, who’s had two and a half years now to think about things, to concoct this story — and I know Dr. Dicke is of the opinion that he was not malingering, but people can be fooled. Mr. Rose has had a lot of time to think about this, and he may have various reasons for coming up with this story if it’s not true . . . . ¶ 17 In its oral ruling, the court explained that skepticism: While the Court finds Dr. Dicke credible, it has serious concerns about the credibility of the information he relied upon in making his diagnoses and rendering his opinions. While Dr. Dicke took care to describe the manner in which Mr. Rose revealed information to him which led him to conclude that Mr. Rose had a diagnosis of [DID], the Court notes that Mr. Rose has had significant time to think about how he wants to approach this and has given varying accounts, depending on the audience, of his background. I question the credibility of that information. Also, Mr. Rose has told Dr. Dicke that his childhood was very abusive. . . . Mr. Rose told the probation office during the presentence 
9 investigation that his childhood was happy, and I didn’t see any allegation of abuse. ¶ 18 We perceive no inconsistency in the court’s credibility findings. True, the court found Dr. Dicke credible as a witness. But that doesn’t mean the court had to accept the veracity of the statements Rose made to Dr. Dicke — particularly given that the court noted inconsistencies between Rose’s description of his childhood to the probation department in the sentencing phase of the case and to Dr. Dicke a few years later while in pursuit of his ineffective assistance claim. See Estate of Owens, ¶ 22. Nor does it mean the court had to accept the authenticity of Rose’s behaviors in front of Dr. Dicke, including the “appearance” of Duke during their second meeting. As the fact finder, the court could find that Dr. Dicke was a credible witness but that Rose had lied about his life history and faked his behaviors so as to trick Dr. Dicke into believing he suffered from DID and wasn’t responsible for the murder. Thus, there is no inconsistency between finding Dr. Dicke credible as a witness and rejecting his diagnosis of Rose. ¶ 19 As his third and final argument, Rose asserts that the postconviction court erred in its alternative finding that even if the 
10 DID diagnosis was accurate, Rose was still responsible for “roll[ing] the dice” the day of the shooting. As the court pointed out, Rose ingested alcohol and methamphetamine and went to the victim’s home with a firearm when he was already agitated with the victim, notwithstanding that he knew alcohol and drugs exacerbated his condition (making it more likely that Duke would take over). Rose insists that the unrebutted testimony at the hearing established that he wasn’t “consistently conscious of Duke.” But Dr. Dicke didn’t testify that Rose was entirely unaware of Duke’s presence, or that Rose was unaware that Duke came out more often when Rose was intoxicated — only that Rose wasn’t “fully conscious” of the murder because Duke had done it. And even if Dr. Dicke had so testified, the court wasn’t obligated to accept that testimony. See Estate of Owens, ¶ 22. ¶ 20 Finally, Rose doesn’t directly confront the court’s ultimate finding — by the same judicial officer who had originally sentenced him — that forty-six years was still an appropriate sentence. The court noted that it had previously considered all the statutory sentencing factors. The court also found that it had considered much of the mitigating evidence Rose presented in his Rule 35(c) 
11 motion, including his good character, substance abuse and mental health issues (aside from the DID diagnosis), and acceptance of responsibility (which, arguably, is inconsistent with and thus undermined by his DID arguments). And the court found that the additional evidence Rose had presented through the motion — which was the same evidence Rose contended his plea counsel should’ve presented at sentencing — did “not change [the court’s] mind about the appropriateness of the sentence it issued.” ¶ 21 For all these reasons, we agree with the postconviction court’s conclusion that regardless of whether Rose’s plea counsel performed deficiently, Rose hasn’t sufficiently established any prejudice from that performance. Accordingly, we affirm the court’s denial of Rose’s Rule 35(c) motion. III. Disposition ¶ 22 The order is affirmed. JUDGE KUHN and JUDGE RICHMAN concur.